855 F.2d 78
 CONSOLIDATED RAIL CORPORATION, Petitioner in No. 86-3798,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Association of American Railroads, Bessemer & Lake Erie
Railroad Company, Edison Electric Institute, The
Fertilizer Institute, and National
Industrial Transportation
League, Intervenors.
ASSOCIATION OF AMERICAN RAILROADS, Petitioner in No. 86-3799,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Consolidated Rail Corporation, Bessemer & Lake Erie Railroad
Company, Edison Electric Institute, The Fertilizer
Institute and National Industrial
Transportation League, Intervenors.
BESSEMER & LAKE ERIE RAILROAD COMPANY, Petitioner in No. 87-3002,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Association of American Railroads, Consolidated Rail
Corporation, Edison Electric Institute and
National Industrial Transportation
League, Intervenors.
ALABAMA POWER COMPANY, Georgia Power Company, Gulf Power
Company, Mississippi Power Company, and Southern Company
Services, Inc., (collectively, the "Southern Electric
System"), Petitioners in No. 87-3325,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Edison Electric
Institute, Consolidated Rail Corporation, and
National Industrial Transportation
League, Intervenors.
WESTERN COAL TRAFFIC LEAGUE, Petitioner in No. 87-3326,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Association of American Railroads, Edison Electric
Institute, National Association of Regulatory Utility
Commissioners, Consolidated Rail Corporation, and National
Industrial Transportation League, Intervenors.
CONSUMER OWNED POWER COALITION, Petitioner in No. 87-3327,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
Association of American Railroads, National Industrial
Transportation League, Consolidated Rail
Corporation, and National Association of
Regulatory Utility
Commissioners, Intervenors.
ATLANTIC CITY ELECTRIC COMPANY, Commonwealth Edison Company,
Madison Gas & Electric Company, New York State Electric and
Gas Corporation, Pennsylvania Power & Light Company, the
Cleveland Electric Illuminating Company, Union Electric
Company, Wisconsin Electric Power Company, and Wisconsin
Power & Light Company, Petitioners in No. 87-3328,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Association of American Railroads, Edison Electric
Institute, Consolidated Rail Corporation, National
Association of Regulatory Utility Commissioners, and
National Industrial Transportation League, Intervenors.
 (ICC Ex Parte No. 393)
Nos. 86-3798, 86-3799, 87-3002, 87-3325 to 87-3328.
 United States Court of Appeals,
Third Circuit.
 Argued May 2, 1988.
Decided Aug. 15, 1988.
 
 Paul A. Cunningham (argued), Robert M. Jenkins, III, Marc D. Machlin, Pepper, Hamilton & Scheetz, Washington, D.C., Laurence Z. Shiekman, Sean P. Wajert, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for petitioners Consolidated Rail Corp. and The Association of American Railroads.
 Alice C. Saylor, Bessemer & Lake Erie R.R. Co., Monroeville, Pa., for petitioners Bessemer & Lake Erie R.R. Co.
 John R. Molm, Charles V. Gerkin, Jr., Troutman, Sanders, Lockerman & Ashmore, Atlanta, Ga., for petitioner Southern Elec. System.
 William L. Slover, C. Michael Loftus, Donald G. Avery, Slover & Loftus, Washington, D.C., for petitioners Western Coal Traffic League and Consumer Owned Power Coalition.
 John M. Cutler, Jr., McCarthy, Sweeney & Harkaway, Washington, D.C., for petitioners Atlantic City Elec. Co., Commonwealth Edison Co., Madison Gas & Elec. Co., New York State Elec. & Gas Corp., Pennsylvania Power & Light Co., and The Cleveland Elec. Illuminating Co.
 Robert S. Burk, Gen. Counsel, Ellen D. Hanson, Associate Gen. Counsel, Charles A. Stark, Atty. (argued), I.C.C., Washington, D.C., for respondent I.C.C.
 Charles F. Rule, Asst. Atty. Gen., John J. Powers, III, John P. Fonte, Attys., Dept. of Justice, Antitrust Div., Washington, D.C., for respondent U.S.
 David A. Sutherlund, La Roe, Winn & Moerman, Washington, D.C., for intervenor The Fertilizer Institute.
 John F. Donelan, Frederic L. Wood, Donelan, Cleary, Wood & Maser, Washington, D.C., for intervenor The Nat. Indus. Transp. League.
 Leonard M. Trosten, Michael F. McBride (argued), Judith Fox, LeBoeuf, Lamb, Leiby & MacRae, Edward H. Comer, Edison Elec. Institute, Washington, D.C., for intervenor Edison Elec. Institute.
 Charles D. Gray, National Ass'n of Regulatory Utility Com'rs, Washington, D.C., for intervenor National Ass'n of Regulatory Utility Comm'rs.
 Before GIBBONS, Chief Judge, HIGGINBOTHAM and COWEN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Various shipper and carrier interests[1] petition for review of an order of the Interstate Commerce Commission (the ICC), 3 I.C.C.2d 261 (1986), which partially revises the decision in Ex Parte No. 393 (Sub.-No. 1), Standards for Railroad Revenue Adequacy, 364 I.C.C. 803 (1981), which this court in Bessemer & Lake Erie R. Co. v. I.C.C., 691 F.2d 1104 (3d Cir.1982), cert. denied, 462 U.S. 1110, 103 S.Ct. 2463, 77 L.Ed.2d 1340 (1983) (Bessemer ) reviewed and affirmed. The order is the product of notice and comment rulemaking. 5 U.S.C. Sec. 553(c) (1982). This court has jurisdiction pursuant to 28 U.S.C. Sec. 2321(a) and 28 U.S.C. Sec. 2342(5) (1982). The scope of our review is determined under 5 U.S.C. Sec. 706(2) (1982). We will affirm 3 I.C.C.2d 261 (1986) in all respects.
 
 
 2
 * The subject of our review is the most recent ICC revision of the appropriate standard for measuring railroad revenue adequacy. "The effect of an ICC determination that a carrier is revenue inadequate ... is to permit rail carriers to raise rates on services as to which they have market dominance, without ICC approval, within the zones of flexibility specified in" the Staggers Rail Act of 1980, Pub.L. 96-448, 94 Stat. 1895 ("the Staggers Act"). Bessemer and Lake Erie R. Co. v. I.C.C., 691 F.2d 1104, 1109 (3d Cir.1982). The revised standard is the ICC's fourth attempt to define and refine a standard of revenue adequacy since the direction to the ICC to develop a revenue adequacy standard issued in the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. 94-210, 90 Stat. 31 (codified as amended at 49 U.S.C. Sec. 10704 (1982)) (the "4R Act"). We described the legislative background of the railroad revenue adequacy standard in Bessemer:
 
 
 3
 The second salient feature of the 4R Act is the enactment of a section dealing with the standard for ratemaking for those market dominant carriers still subject to ICC ratemaking jurisdiction. Section 205 of that Act directed the ICC:
 
 
 4
 within 24 months after the date of enactment of this paragraph, after notice and an opportunity for a hearing, [to] develop and promulgate (and thereafter revise and maintain) reasonable standards and procedures for the establishment of revenue levels adequate under honest, economical, and efficient management to cover total operating expenses, including depreciation and obsolescence, plus a fair, reasonable, and economic profit or return (or both) on capital employed in the business.
 
 
 5
 Congress further directed that: [s]uch revenue levels should (a) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation and (b) insure retention and attraction of capital in amounts adequate to provide a sound transportation system in the United States. [49 U.S.C. Sec. 10704 (a)(2).]
 
 
 6
 Acting under the mandate of section 205 the Commission conducted two revenue adequacy proceedings [issuing in Ex Parte No. 338, Standards and Procedures for the Establishment of Adequate Revenue Levels, 358 I.C.C. 844 (1978); Ex Parte No. 353, Adequacy of Railroad Revenue (1978 Determination), 362 I.C.C. 199 (1980) ]. Meanwhile two major midwestern railroads went bankrupt, necessitating emergency federal legislation. Congress, apparently dissatisfied with the pace of the ICC's revenue adequacy proceedings, passed [the Staggers Act]. That Act amended the 4R Act in several respects. In an effort to increase railroad revenues, it created zones of rail carrier rate flexibility in which even market dominant carriers, if found to be revenue inadequate, could increase rates without ICC approval. The Staggers Act also amended section 205 of the 4R Act to provide that "[t]he commission shall maintain and revise as necessary standards and procedures for establishing revenue levels." Pub.L. 96-448, Sec. 205(b)(1). Moreover the ICC was directed to conclude a section 205 proceeding within 180 days after the effective date of the Staggers Act. Pub.L. 96-448 Sec. 205(b)(3).
 
 
 7
 Bessemer, 691 F.2d at 1108-09 (footnotes omitted). In response to the passage of the Staggers Act, the ICC conducted a third notice and comment rulemaking proceeding issuing in Ex Parte No. 393, 364 I.C.C. 803 (1981). That revenue adequacy standard differed from those adopted earlier in Ex Parte Nos. 338 and 353 in that it (1) "determined that a railroad would be considered revenue adequate when it received a rate of return on net investment equal to the current cost of capital"; (2) "determined to measure current cost of capital by examining current cost of debt, rather than embedded or historical cost of debt, together with current cost of equity"; and (3) "included reserves for deferred taxes, authorized use of betterment accounting for valuation of track assets, valued assets at depreciated book value, and included in the investment base unused and unusable assets" in determining the rate base. Bessemer, 691 F.2d at 1109. This court affirmed the revenue adequacy standard adopted in Ex Parte No. 393 in all respects. Bessemer, 691 F.2d at 1116.
 
 
 8
 Following Bessemer, in March 1983 the ICC issued a rulemaking notice "proposing substantial changes in Ex Parte No. 393." I.C.C. March 9 Decision, J.A. at 1. The ICC indicated that the reason for the proposed revisions was "to provide a more accurate reflection of the profitability of railroad operations." Id. Specifically, the ICC proposed to consider:
 
 
 9
 (1) calculation of Return On Investment (ROI) to consider exclusively all transportation elements of income, expense, and investment; (2) Use of normalized or weighted normalized data to compute ROI; (3) Computation of ROI on a consolidated basis to include railroad affiliates; and (4) Conversion from an original cost investment base to one based on current or replacement costs in revenue adequacy determinations....
 
 
 10
 Id. In addition, the ICC invited comment on the treatment in revenue adequacy determinations of the deferred tax reserves created under the Economic Recovery Tax Act of 1981 ("ERTA"). Id.
 
 
 11
 The 1983 notice elicited lengthy comments from both railroads and shippers. After considering those comments for nearly three years, the ICC issued a notice of its decision to expand the scope of its proceedings due to its "increasing[ ] concern[ ] that the annual revenue adequacy calculations produced under [the Ex Parte No. 393] standard may not have provided what we would consider to be a realistic picture of the current state of the rail industry." Standards for Railroad Revenue Adequacy, Decision of May 30, 1986 (order served June 5, 1986, J.A. at 557). (The ICC expressed the same concern about the inaccuracy of the standard one month earlier in an unpublished decision, served May 5, 1986 under the title Ex Parte No. 463, Railroad Revenue Adequacy-1984 Determination.) The perception that the standard might be inaccurate stemmed from the observation that no Class I railroads had been found to be revenue adequate under the prevailing standard since 1980. Id. at 558. According to the ICC, this conflicted with the expectation that the passage of the Staggers Act would improve the financial condition of the railroads, and with the "widely held perception that the railroad industry is now in reasonably good financial condition." Id. at 574. From this, the ICC concluded that the current standard was not "sufficiently realistic." Id. To remedy the asserted lack of realism and accuracy, the ICC now proposed:
 
 
 12
 1. To substitute depreciation for betterment accounting for road and track structures. Id. at 572-73.
 
 
 13
 2. To substitute the embedded cost for the current cost of debt to compute the cost of capital. Id. at 570.
 
 
 14
 3. To adjust the measurement for the deferred tax reserves accumulated under the ERTA. Id. at 568-69.
 
 
 15
 The ICC invited comment on these and other factors relating to the measurement of railroad revenue adequacy.
 
 
 16
 In response to this notice, the railroads and shippers filed voluminous comments and reply comments. The shippers supported the new proposals advanced in the June 5, 1986 notice with the qualification that in converting from betterment to depreciation accounting, measures were required to prevent charging previously expensed assets a second time as depreciation. Shippers' Opening Comments at 3, J.A. at 613. By contrast the railroads opposed many of the proposed measures, including--notably for the purposes of this appeal--the proposal to substitute embedded for current cost of debt in the computation of capital, Supplemental Comments of the AAR at 64-74, J.A. at 887-92, and the proposal to exclude the value of deferred taxes from the investment base, id. at 59-63, J.A. at 1759-63.
 
 
 17
 On December 31, 1986 the ICC issued its final decision. Ex Parte No. 393 (Sub. No. 1), Standards for Railroad Revenue Adequacy, 3 I.C.C.2d 261 (1986), J.A. at 2019 ("the final decision"). The final decision, containing five key provisions, adopted only some of the changes proposed. It adhered to the original No. 393 decision, affirmed in Bessemer, by (1) continuing the use of the cost of capital as the sole test of revenue adequacy, (2) retaining the current cost, as opposed to the embedded cost, of debt in computing the cost of capital, and (3) continuing the policy of making no adjustment for unused and useless assets. The ICC did adopt two of the proposed revisions to the previous standard: (4) shifting from betterment to depreciation accounting, and (5) excluding the value of the deferred tax reserves from the investment base.
 
 II
 
 18
 The shipper interests have petitioned for review of the final decision, challenging (1) the continued use of the cost of capital as a single standard for determining revenue adequacy; (2) the retention of the current cost of debt in the cost of capital calculation; (3) the failure to exclude unused and useless assets from the investment base; and (4) the method of transition from betterment to depreciation accounting. The railway petitioners challenge (5) the exclusion of the deferred tax reserves from the investment base.
 
 A. The Shippers' Contentions
 
 19
 (1) Single Measure--Cost of Capital
 
 
 20
 Certain shippers contend that the use of a single financial indicator--the cost of capital--to measure railroad revenue adequacy is not in accordance with the 4R Act because that Act (49 U.S.C. Sec. 10704(a)(2)) refers to revenue adequacy "standards" in the plural. Certain Shippers Brief at 5. In addition to the grammatical form of section 10704(a)(2), the shippers refer also to the legislative history, in which the Senate Committee on Commerce stated that sufficient capital to maintain service and adequate return on investment are two equally important considerations, as evidence of the " 'unambiguously expressed intent of Congress' that the ICC use more than one standard to determine revenue adequacy." Certain Shippers Brief at 6 (quoting INS v. Cardoza-Fonseca, 480 U.S. 421, 445, fn. 29, 107 S.Ct. 1207, 1220, fn. 29, 94 L.Ed.2d 434 (1987) and citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). As further support for their position that section 10704(a)(2) compels the use of multiple financial indicators, the shippers point out that the ICC's first revenue adequacy standard decision in 1978 determined to use multiple criteria rather than the sole criterion of the rate of return at the cost of capital rate, and, further, that Congress did not object to this decision when it drafted the Staggers Act. Certain Shippers Brief at 7-8. Thus asserting that the singular use of the cost of capital standard contradicts the requirements of section 10704(a)(2), the shippers urge the conclusion that the single standard must be set aside under the Administrative Procedure Act for being "not in accordance with law." 5 U.S.C. Sec. 706(2)(A).
 
 
 21
 The shippers further argue that the deferential standard of review applied by this court in Bessemer is not appropriate to this issue because, they claim, the assertion that section 10704(a)(2) requires multiple standards is a matter of "pure" statutory interpretation, not within the agency's scope of discretion over policy choices. Certain Shippers Reply Brief at 3. They urge that under Chevron, such "pure issues of statutory construction" are subject to the independent review of the court. Because (they claim) the single cost of capital standard is a matter of pure interpretation, they conclude that we must review that interpretation independently, not deferentially as in Bessemer. Certain Shippers Brief at 3. Even if we were convinced by the shippers' argument, we would not be free to adopt it in this appeal. We were presented with the identical issue in Bessemer, and we there held that the single cost of capital standard is consistent with the statute. Bessemer, 691 F.2d at 1113. That decision is binding on us; we cannot overrule it except in banc. Moreover, even a court in banc cannot disregard the collateral estoppel effects of a prior civil judgment.
 
 
 22
 But in any event, a reversal of the Bessemer decision is not called for because it is entirely consistent with currently prevailing law, including the Supreme Court's subsequent decision in Chevron. Under Chevron, the court does not defer to the agency's construction if Congress has unambiguously expressed its intent with respect to the precise question at issue, Chevron, 467 U.S. at 842-43, 104 S.Ct. at 2781; if, on the other hand, Congress has not expressed its intent with such precision and absence of ambiguity, then the court should defer to the agency's constructions "unless they are arbitrary, capricious, or manifestly contrary to the statute," id. at 844, 104 S.Ct. at 2782 (footnote omitted)--that is, the agency decision is subject to the same traditional deferential standard of review articulated and applied in Bessemer.
 
 
 23
 Contrary to the shippers' claim, the statute does not evince the unambiguous intent (to require multiple standards) necessary to avoid the normal deferential standard of review under Chevron. Rather, the authorization of cost of capital as a single standard is at least an equally permissible interpretation of the statute. So we held in Bessemer when we approved as permissible (and thus did not merely defer to) the ICC's reading of statutory references to multiple objectives as not necessarily requiring each their own standard, but rather, being satisfied by a single standard that "encompasses" all of them. Bessemer, 691 F.2d at 1113. This interpretation being permissible, we stated that "[w]hile some other standard or combination of standards might also accomplish the overall objectives of the 4R and Staggers Acts, the choice among permissible alternatives is to be made by the agency to which rulemaking authority has been delegated, not by this court." Id. This position is entirely in accord with the holding in Chevron that "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency." Chevron, 467 U.S. at 844, 104 S.Ct. at 2782 (footnote omitted).
 
 
 24
 Because we upheld the single cost of capital standard in Bessemer, and because that decision was based on the sound rationale that the single standard represented a permissible interpretation of the statute, we must reject the claim that the standard is contrary to law. The shippers do not allege that the decision to retain the single standard is arbitrary, capricious, or an abuse of discretion, nor do they proffer any additional reason for setting it aside under 5 U.S.C. Sec. 706. Therefore, we must affirm the single standard.
 
 
 25
 (2) Current Versus Embedded Debt
 
 
 26
 The shipper petitioners contend that the ICC's decision to continue using the current cost of debt to calculate the cost of capital is arbitrary, capricious and contrary to law. Shippers Brief at 37. Like the single standard issue (1), this issue is controlled by Bessemer. Moreover the decision in Bessemer affirming the use of current cost is sound.
 
 
 27
 First, the contention that the use of current cost is contrary to law is unsound because it is based on an incorrect and partial reading of the statute, under which "windfalls" to the railway are supposedly forbidden, ignoring the capital attraction objective established in section 10704(a)(2). As noted in Bessemer, the statutory scheme does not require that the railroads be deprived of the leverage or windfall resulting from the age and low interest rates of the debt instruments. Bessemer, 691 F.2d at 1114. On the contrary, "[s]uch an interpretation of the statute would be inconsistent with the expressed intent of opening capital markets to the railroads, and of encouraging reinvestment of internally generated funds" because "[i]f the railroads could not gain a rate of return on investment represented by old debt in excess of the old interest rates on such debt, they would be unlikely to attract new equity capital, and their shareholders would insist on investment of internally generated funds outside the rail industry." Id. The windfall argument is thus soundly disposed of in Bessemer as being itself in conflict with the capital formation objectives expressly articulated in the statute.
 
 
 28
 The shippers' further argument that the use of current rather than embedded cost of debt is arbitrary and capricious amounts to no more than a restatement of the view that no excess--or "windfall" in the shippers' usage--above a merely adequate return may permissibly accrue to the railroads. As explained in Bessemer, this view ignores the capital formation goals of the railway deregulation statutory scheme. Therefore, we must apply Bessemer's holding affirming the use of the current cost of debt as not merely binding, but also sound.
 
 
 29
 (3) Exclusion of Unused and Useless Assets
 
 
 30
 Certain shippers also challenge the ICC's continued determination not to exclude unused and useless assets from the rate base as conflicting with the statutory mandate to set a return on capital "employed in the business." 49 U.S.C. Sec. 10704(a)(2). According to their reading, the positive prescription of maintaining standards adequate to cover a return on "capital employed in the business" implies the negative prescription of excluding capital not employed in the business. They reinforce this reading by reference to the qualification of "honest, economical and efficient management." 49 U.S.C. Sec. 10704(a)(2). In this view, unused and useless assets are not "employed in the business," (emphasis added) and therefore, an honest, economical and efficient accounting of a return on capital employed in the business should exclude them from the investment base.
 
 
 31
 The ICC has never excluded unused or useless assets from the rate base although in one of its earlier decisions the ICC did note that it "must be careful not to overvalue the investment base by including in it assets that are neither used nor useful." 364 I.C.C. at 811 (quoted in Bessemer, 691 F.2d at 1115). In Bessemer, we held that "the failure to calculate and exclude value of unused or unuseful assets, for purposes of the initial revenue adequacy determination mandated by the Staggers Act, was not arbitrary, capricious, or an abuse of discretion." Id. at 1115 (emphasis added). However, we also concluded there that the issue of the future treatment of unused and useless assets, beyond the necessarily expeditious initial determination mandated by Sec. 205(b)(3) of the Staggers Act was not ripe for review. Id. at 1116. Therefore, Bessemer does not control, and we must now determine for the first time whether the ICC decision not to exclude such assets, as a continuous and not merely an initial policy, is arbitrary, capricious or contrary to law. 5 U.S.C. Sec. 706(2).
 
 
 32
 The ICC rejects the shippers' charge that the "honest, economical and efficient" calculation of an adequate return on "capital employed in the business" prescribed by 49 U.S.C. Sec. 10704(a)(2) requires the exclusion of unused and useless assets on both legal and economic grounds. As a purely legal matter, the ICC rejects the position that section 10704(a)(2) requires the exclusion by its terms on the basis of the following statutory interpretation:
 
 
 33
 Section 10704(a)(2) contains no reference to unused and useless assets. Moreover, the statute does not refer to "assets employed" but to "capital employed".... We read the statute's focus on "capital employed" as an investor-oriented approach to revenue adequacy which calls for the commission to measure the return earned on all investments in a railroad until those investments are written off the railroad's books under GAAP [Generally Accepted Accounting Principles]. Consistent with GAAP, our railroad accounting regulations provide for the retirement of assets whose useful life has expired from the asset account in which they are carried.... We do not read Sec. 10704(a)(2) as requiring the commission to sprint ahead of the normal accounting process to identify and exclude assets from the net investment base in our revenue adequacy determination when they have not been formally written off the railroad's books of account.
 
 
 34
 3 I.C.C.2d at 290-91, J.A. at 2048-49. Thus the ICC characterizes the dispute not as a question of whether unused and useless assets should be removed from the investment base, but simply as a question of the "timing and manner" of their exclusion; and reads the statute as allowing the ICC discretion over such practicalities.
 
 
 35
 In making its practical assessment accordingly, the ICC discounted the need for the exclusion in revenue adequacy calculations by the availability of other methods of removing unused and useless assets from the investment base: namely, existing accounting regulations providing for the retirement of such assets and rate reasonableness proceedings. 3 I.C.C.2d at 2049-50. The ICC further discounted the benefit of the proposed exclusion by the assertedly "de minimis " magnitude of such assets and the correspondingly de minimis effect of their exclusion on the revenue adequacy calculation. 3 I.C.C.2d at 2053. The ICC concluded that such discounted benefits were outweighed by the costs of the "mammoth undertaking" of an annual review of each rail carrier's asset portfolio to identify unused and useless assets. Id. at 2051. The ICC buttressed its assertion that the statute authorized such a cost/benefit analysis (as opposed to, in the shippers' reading, requiring the exclusion without regard to overall economy) with a reference to section 10101a(14) of 49 U.S.C., which directs the Commission to "ensure the availability of accurate cost information in regulatory proceedings while minimizing the burden on rail carriers of developing and maintaining the capability of providing such information." 3 I.C.C.2d at 2051.[2]
 
 
 36
 The ICC and the certain shippers both offer plausible constructions of section 10704(a)(2). The certain shippers plausibly contend that, as a definitional matter, "capital employed in the business" should be understood to exclude property that is not actually being used in the business. But it is an equally plausible reading, offered by the ICC, that the statutory requirement of a "reasonable and economic return on the capital employed in the business" permits the agency to undertake a cost/benefit analysis of the effect of performing such an exclusion in revenue adequacy proceedings. We cannot say that this reading is arbitrary, capricious or manifestly contrary to the statute, and therefore we must defer to it. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782.
 
 
 37
 Given this permissible construction of the statute, giving the ICC discretion to decide whether an exclusion of unused and useless assets is necessary to assure a reasonable and economic return, we are left with the question of whether the policy analysis relied on by the ICC in its discretion constituted error under 5 U.S.C. Sec. 706. The shippers do not expressly argue that the cost/benefit analysis undertaken by the ICC was arbitrary, or constituted an abuse of discretion, concentrating as they do on the prior question of statutory authorization which we have resolved against them. However, their arguments against the availability of alternative manners of excluding the value of unused and useless assets could be understood as a challenge to the soundness of the ICC's policy determination under 5 U.S.C. Sec. 706.
 
 
 38
 In evaluating this challenge to the ICC's policy decision, we must recall that under our narrow scope of review, we may not independently "weigh the evidence before the ICC." Bessemer, 691 F.2d at 1110. Only if the ICC's rationale "runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," Motor Vehicle Mfrs. Assn. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), can we set the decision aside.
 
 
 39
 Applying this deferential standard, we cannot conclude that the agency's decision is "implausible" or "runs counter to the evidence" before it. The ICC concluded that performing the exclusion in revenue adequacy proceedings would be a "mammoth undertaking," 3 I.C.C.2d at 2051, the costliness of which is undisputed. In response to the shippers' attempt to identify more than a de minimis amount of assets at stake, the ICC concluded that the "shippers offer purely subjective judgments that certain rail assets are not used and useful." 3 I.C.C.2d at 2053. We have no ground for holding that these conclusions are irrational. And they provide a reasonable basis for the determination that the proposed exclusion is not necessary to calculate a reasonable and economic return, and that the costs of performing such an exclusion outweigh the benefits. Therefore, there are no grounds for finding the decision not to exclude unused and useful assets from the investment base arbitrary, capricious, contrary to law or an abuse of discretion under 5 U.S.C. Sec. 706, and it must be affirmed.
 
 
 40
 (4) Shift to Depreciation Accounting
 
 
 41
 In the final decision now before us for review, the ICC switched from the system of betterment accounting, affirmed in Bessemer, 691 F.2d at 1114-15, to a system of depreciation accounting. The parties are all in agreement that the decision to use depreciation accounting is proper. The only contention, raised by the shippers, is that the method of transition from the former accounting system to the present one is arbitrary and capricious because it overstates the railroads' investment and understates their income.
 
 
 42
 Under both accounting systems, the initial investment in track is capitalized in the year that investment was made. The difference lies in the timing of the expensing of the original capital investment, and the timing of the expensing and capitalization of subsequent investments. Under betterment accounting, the capitalized costs are not expensed until abandonment of the property, at which time they are expensed against current earnings. Those capitalized costs include not only the initial investment, but also the incremental costs of upgrades or improvements (hence, the title "betterment" accounting), with all other track investments in mere maintenance having been expensed in the year made. By contrast, under depreciation accounting, all track investments--initial and subsequent, for maintenance and for improvement--are treated similarly; the cost of each asset is capitalized in the year purchased, and the expensing of the cost (less salvage value) is apportioned over the life of the asset.
 
 
 43
 The dispute here concerns the valuation of the capital investment to be used as the starting point for the new system of depreciation accounting. The dispute arises because the old betterment accounting system, interrupted prior to abandonment, records the value of current track investments differently than would depreciation accounting. That is, even though by the end of the life cycle of all assets, the total amount expensed under each accounting system is equal, the transition occurred at mid-cycle (before all assets have been abandoned), at which point the two systems value the amount expensed versus the amount currently capitalized differently. Under the approach favored by the shippers, the accounts recorded on the books under the betterment system reflect the total expensing of all investments in maintenance and replacement, and the "frozen" capitalization of all investments in initial tracks and improvements that have not yet been abandoned. Under the approach adopted by the ICC, and favored by the railroads, the amounts capitalized recorded on the books would be "restated" as the cost of the most recent replacement, less depreciation, thereby representing the amount capitalized as if a depreciation accounting system had been used all along. The parties agree that before the end of the life cycle the ICC's restatement has the effect of valuing the investment base at a significantly higher amount than that accounted for under the betterment system. Joint AAR Brief at 35; Shippers Brief at 22. The shippers charge that the increase represents an "overstatement" of the amounts actually invested in track structures, including for future depreciation sums that were already expensed, thereby yielding to railroads a "double recovery" of their investment costs. Shippers Brief at 19-28. The shippers further charge that the write-up is an impermissible attempt to compensate for inflation, id. at 28-35, and an improper attempt at retroactive ratemaking, id. at 36-37.
 
 
 44
 In its final decision, the ICC carefully addressed the shippers' contention that a double recovery will result from the restatement "because any 'replacement' component of the last track installation will already have been recorded as an expense on the carrier's books." 3 I.C.C.2d at 285-86, J.A. at 2043-44. Upon consideration, the ICC rejected this argument on the basis of its belief that no double recovery would in fact occur. Id. at 2044. The ICC supported this view with several reasoned arguments. First it reasoned that in real economic terms (as opposed to paper recording), the first expensing represented the cost of the old track being replaced rather than (as was formally recorded) the cost of the new replacement track. Id. at 2044. Considering that under betterment accounting the cost of the initial track is never expensed until final abandonment, this argument makes sense. Since the transition occurs prior to abandonment, the initial cost has not been expensed. Thus, however many charges for replacement have been expensed under betterment accounting, that number is one less than the actual number of investments made. Therefore, it is appropriate in economic terms to consider the expense recorded for the first replacement as a charge for the initial investment, the expensing of the second replacement as the charge for the first, and so on--with the effect that every investment is accounted for and expensed except the last one, which accurately represents the current investment.
 
 
 45
 The ICC concedes that due to inflation, the restatement, attributing the later cost to the prior (or original) investment, may result in attributing a higher cost to the original investment than was actually paid for it at the time. 3 I.C.C.2d at 286, J.A. at 2044. The shippers argue that inflation provides no justification for the "write-up," Shippers Brief at 28, because: (1) the ICC elsewhere in its decision rejected current cost accounting (adjusting for inflation) in favor of historical cost accounting, id. at 29 (citing 3 I.C.C.2d at 284, n. 33); (2) under historical cost accounting, the only coverage for inflation afforded to the railroads is an opportunity to earn at least an adequate return on investment considering inflation, and not an adjustment of the cost of assets, id. at 31; and (3) the adjustment for inflation embodied in the "write-up" impermissibly makes today's ratepayers compensate for yesterday's supposed under-recovery, id. at 30. All of these arguments, if not fundamentally misplaced, at the least fail to demonstrate that there was no rational basis for the ICC's contrary decision.
 
 
 46
 We note, first, that the ICC's decision to reject a system of current cost accounting, 3 I.C.C.2d at 284 n. 33, cited at Shippers' Brief at 29, did not refer to the system for accounting for road and track structures. Second, the shippers imply that the ICC's recognition of the effect of inflation is equivalent to the adoption of current cost accounting. But the dispute here is not over current cost versus historical cost accounting; depreciation accounting is a variant of historical cost accounting. The recognition of the effect of inflation simply accounts for the discrepancy between the paper value and the putative economic value of the historical costs. As the ICC explained in its decision, "the replacement expense taken under [betterment accounting] reflected the then-present value of the original track investment," 3 I.C.C.2d at 286, J.A. at 2044, which had not been expensed until that point, but would have been under depreciation accounting. The impact of inflation is noted in the transition because, under betterment accounting, not all investments had been expensed contemporaneously. Therefore, the increase due to inflation does not represent an adjustment for earlier underrecovery, but rather an effect of accurately accounting for the present-value of a delayed expense. For the same reason, the shippers' contention that the opportunity to earn an adequate return on investment adequately compensates the railroads for the effect of inflation is unpersuasive. The effect of inflation observed is not due to an "adjustment" designed to approximate the current replacement cost, but an accurate reflection of the present value of the historical cost of the original track that was never before expensed. Furthermore, none of the railroads have been found to have earned an adequate return on their investment. Finally, given (as is demonstrated above) that the restatement represents an accurate reflection of current investment, and, therefore, of the value of services currently provided, it is spurious to suggest that current ratepayers are being forced to pay for yesterday's inadequacies.
 
 
 47
 In addition to the proposition that the amounts expensed represented the cost of former, not contemporaneous, investments, the ICC also disputed the assumption that all the expenses recorded were actually recovered. 3 I.C.C.2d at 287, J.A. at 2045. The ICC supported this position with a comparison of the amount of revenue shortfall with the amount expensed. Because the former greatly exceeded the latter, the ICC concluded "with confidence that [the betterment accounting] expenses have not been fully recovered in the past and therefore no adjustment is necessary to prevent a double recovery." Id.[3]
 
 
 48
 We cannot say that there is no rational basis for the positions endorsed by the ICC. They are supported by evidence in the form of the expert testimony of Drs. Baumol and Willig, J.A. at 973-76, and Dr. Lassman, J.A. at 1237-43. And although other testimony (that of Dr. Kahn) supports the opposing view of the shippers, our role is not to weigh the competing evidence, Bessemer, 691 F.2d at 1110, unless it is wildly implausible, State Farm, 463 U.S. at 43, 103 S.Ct. at 2866, which is certainly not the case here. Therefore, we must uphold the ICC's chosen method of restatement from betterment to depreciation accounting as supported by a rational basis.
 
 B. The Railroads' Contention
 
 49
 (5) Exclusion of Deferred Tax Reserves
 
 
 50
 The fifth and final issue presented by this appeal, perhaps the most significant change adopted in the final order, is the ICC decision to exclude the value of deferred tax reserves from each carrier's net investment base in calculating the return on investment in revenue adequacy proceedings. 3 I.C.C.2d at 269, J.A. at 2027. Under Title II of the Economic Recovery Tax Act of 1981 ("ERTA"), Pub.L. 97-34, 95 Stat. 172, Sec. 201(a), (codified at 26 U.S.C. Sec. 168), railroads, like other businesses, were permitted to take accelerated depreciation, creating large accumulations of deferred tax reserves. In its previous decision, reviewed in Bessemer, the ICC had chosen to include deferred tax reserves in the investment base. We there approved the ICC's decision, reasoning:
 
 
 51
 [F]or all businesses accelerated depreciation is a source of funds which may be reinvested. If the railroad industry were to be put in the position that unlike unregulated industries it could not earn a rate of return on investment of such funds, it would be at a competitive disadvantage in seeking equity capital, and it would be encouraged to invest the funds generated from accelerated depreciation elsewhere than in the railroad business. Perhaps in balancing the competing interests for shippers and rail carriers a commission decision excluding reserves for deferred taxes from the rate base would be a defensible interpretation of [the Staggers Act]. Indeed that was the I.C.C.'s earlier position [footnote omitted]. In Ex Parte No. 347 (Sub-No. 1), (1980) Coal Rate Guidelines Nationwide, 364 I.C.C. 360, however, it reconsidered that position. Both in that case and in Ex Parte 393 it recognized that excluding deferred taxes from the rate base would provide an incentive for railroads to invest in non-rail assets. It would, moreover, produce a rate of return below the cost of capital, since capital markets act with knowledge of the availability of accelerated depreciation as a source of funds.
 
 
 52
 Bessemer, 691 F.2d at 1116. Thus, Bessemer approved the inclusion of deferred tax reserves in the investment base, while leaving open the question of whether their exclusion could be consistent with a "defensible interpretation" of the Staggers Act.[4]
 
 
 53
 After Bessemer, in its 1983 notice of rulemaking on the revenue adequacy standard, the ICC noted that it would consider the impact of the ERTA, but expressed its initial inclination as being "to continue our policy of permitting railroads to retain the full tax benefits of these new provisions, as intended by Congress." J.A. at 13. Despite this initial inclination, the ICC issued an interim decision in 1986 in which it proposed to adjust the revenue adequacy determination for the deferred income tax reserves by treating them as a zero cost component of the railroads' capital structure. J.A. at 569. Finally, the ICC decided to adjust the revenue adequacy determination for the deferred taxes, but to do so by deducting their value from each carrier's net investment base, rather than by treating them as a zero cost capital component. 3 I.C.C.2d at 272-73, J.A. at 2030. The shippers support this final decision, and the railroads oppose it.
 
 
 54
 The railroads oppose the exclusion of the deferred tax reserves from the net investment base on the grounds that the decision (1) is contrary to law, because it conflicts with the return on capital directive of section 10704(a)(2) of the Staggers Act, and with the capital attraction and investment incentive goals of both the Staggers Act and the ERTA, and (2) is arbitrary and capricious because it is not rationally explained, and, further, fails to respond to certain concerns properly raised by the railroads in the notice and comment proceedings.
 
 
 55
 The railroads claim that the exclusion is inconsistent with the Staggers Act and with the ERTA for several reasons. First they contend that, as a definitional matter, the "capital employed in the business," as to which section 10704(a)(2) requires the assessment of a reasonable return, must include the funds generated by the tax deferral because those funds are employed in the business. Joint AAR Brief at 28. This definitional argument is as unpersuasive as the ICC's counter-argument that the investment base, upon which an adequate return is calculated, cannot include the deferred tax reserves because they are a no-cost source of capital. 3 I.C.C.2d at 272, J.A. at 2030. Neither of these attempts to define away the problem proves anything. The relevant questions are not whether the funds generated from the tax deferral are cost-free (no one denies that they are), or whether they are invested in the business. The relevant questions are whether they will be invested in the business if not included in the net investment base, and whether the applicable statute intended them to be so invested.
 
 
 56
 The railroads' second argument for the proposition that the exclusion is contrary to law is more to the point. They argue that the effect of excluding the tax reserves from the railroad investment base for purposes of the return on investment calculation will be to deprive them of the opportunity to earn a return on those funds that other unregulated businesses retain, thereby discouraging investment in the regulated railroads in favor of the other unregulated industries where the opportunity to earn a return on those funds is available. The railroads further contend that this investment disincentive conflicts with Congress' intent embodied in both the Staggers Act, 49 U.S.C. Sec. 10704(a)(2)(A) and (B), and the ERTA, to encourage investment in the railroads.
 
 
 57
 The ICC, supported by the shippers, both disputes the railroads' portrayal of the effects of the deferred tax exclusion (elimination of railroad investment incentive) and contests the railroads' claim that the effects conflict with congressional intent.
 
 
 58
 The ICC's disputation over the incentive effect of the exclusion centers on its claim that rather than completely abolishing the desired incentive to invest in railroads, it is merely eliminating one half of a "double benefit" conferred on the railroads under the ERTA. 3 I.C.C.2d at 272, J.A. at 2030. As the ICC explains it, the double benefit consists in (1) the ability "to demand rates sufficient to cover tax liabilities not yet paid," and (2) the ability "to collect additional profits" on the funds generated by the deferred payment of those liabilities. Id. The ICC maintains that removing the latter benefit, while retaining the former, will not create a disincentive for investment in the railroads because "[t]he adjustment in no way requires the railroads to forfeit any cash flow benefits which they are entitled to under the tax law and allows them to invest the proceeds as they see fit." 3 I.C.C.2d at 273, J.A. at 2031.
 
 
 59
 This argument ignores the fact, emphasized by the railroads, that they have to compete for capital with unregulated firms which do retain the second benefit of an opportunity to earn a return on those funds. Given the competition between the railroads and unregulated firms for capital, the railroads are substantially disadvantaged by being deprived of the opportunity to earn a return on the funds in comparison to the unregulated firms, and therefore the incentive to all investors, including the railroads, is to invest in the unregulated firms where the advantage of the "double benefit" is retained. This incentive effect, the railroads contend, is contrary to the capital attraction goals of the Staggers Act and the ERTA.
 
 
 60
 The shippers (but not the ICC) further dispute the creation of an investment disincentive effect by arguing, first, that the exclusion simply "emulates" the competitive market and therefore does not operate as a competitive disadvantage, Joint Shippers Brief at 16, 27 (citing testimony of Dr. Kahn), and, second, that the railroads are not denied the opportunity to earn a return on the assets acquired with deferred taxes. Id. at 21. Both of these propositions depend on a conception of what the revenue adequacy standard is supposed to reflect that excludes deferred tax reserves tautologically. Thus the shippers support the first proposition that the exclusion merely emulates the competitive result with reference to Dr. Kahn's testimony that the availability of tax incentives to unregulated business has the effect of encouraging greater levels of investment "until such point as prospective returns were once again reduced to the cost of capital." Kahn Statement, J.A. at 688. Dr. Kahn concludes that denying railroads a return in excess of the cost of capital by excluding assets acquired with deferred taxes "therefore emulates the competitive result...." Id. Kahn acknowledges that in the case of unregulated businesses (but not in the case of the railroads), the reduction of returns to the cost of capital is preceded by "additional investment," id., but treats this difference between unregulated businesses and railroads as insignificant on the ground that "regulation that allows companies to earn the cost of capital is ... fully sufficient to elicit whatever levels of investment are economically required, and therefore to meet the standards of revenue adequacy prescribed by the Staggers Act." Id. at 689. Kahn further asserts that "[t]here is nothing in the commission's recognition--along with other regulators--that the deferred-tax funds are a zero-cost source of capital, that biases" the investment choice between rail and non-rail assets. These assertions depend on the tautology, rejected above, that because deferred tax funds are cost-free they are not (properly considered) part of the value of the capital upon which the return on capital should be calculated. This definitional argument simply ignores the fact that the comparison between regulated railroads and unregulated businesses, rather than abstract definitions, is what affects the investment choice between rail and non-rail assets. Even if the definition of cost-free assets as not being a component of the capital base is in some sense correct, so long as unregulated businesses provide a return on those assets while railroads do not, the incentive will be to invest in unregulated non-rail assets.
 
 
 61
 The shippers also deny that the exclusion from the capital base of assets acquired with tax reserves in revenue adequacy proceedings has the effect of depriving the railroads of the opportunity to earn a return on the excluded capital. Joint Shippers Brief at 21. This is so, the shippers claim, because the adequate return on capital calculated in a revenue adequacy proceeding functions not as a cap on allowable earnings, but rather as a measure of financial health. Id. at 21, n. 18. The lower measure of adequate earnings that results from the exclusion of deferred taxes will have the effect, they point out, not of limiting railroads' earnings to that standard of adequacy, but merely of restricting the availability of rate flexibility (and thus of higher rates) afforded under the statute only to revenue inadequate railroads.
 
 
 62
 This observation, however, does not suggest that the ability of railroads and unregulated businesses to earn a return on the deferred tax fund is equal, thereby implying the lack of a disincentive effect. In fact, the railroads' ability to earn a return on the deferred tax reserves is not equal to that of unregulated businesses because the rates charged by the regulated railroads, unlike those of unregulated ones, are limited by regulation--unless they are found to be revenue inadequate. Thus, the lowering of the standard of revenue adequacy that results from excluding deferred taxes from the investment base in the calculation has the effect, not only of increasing the likelihood of finding a railroad to be revenue adequate, but also, accordingly, of lowering its rates and thereby decreasing its overall earnings. The comparable unregulated industry is obviously not subject to the same effect of lowered rates. In comparison to unregulated businesses, the regulated railroad will yield an overall lower rate of return, due to the lowered rates resulting from the lower standard of revenue adequacy, which in turn results from the exclusion of the deferred tax funds from the investment base in calculating the standard. The ultimate result, then, is a disincentive to invest in rail assets due to the higher overall rate of return on non-rail assets. Therefore, we reject the claim that the exclusion will not create a disincentive to invest in rail assets. What remains to be considered is whether this disincentive effect conflicts with the relevant laws or whether, alternatively, the ICC had discretion to select a method of calculation that has this effect.
 
 
 63
 The railroad argues that the disincentive effect violates both the Staggers Act and the ERTA, and their shared objective of enabling railroads to attract and retain capital. The ICC, first, denies that its decision must conform to the ERTA, and, second, insists that the capital attraction objective of the Staggers Act is qualified by the additional objectives of accuracy and fairness to shippers which give it the discretion to qualify the railroads' ability to attract capital in the way it did.
 
 
 64
 The ICC's argument that the ERTA is irrelevant to its mandate depends on the assumption that the Staggers Act and the ERTA are in conflict with each other. Thus, the ICC argues that it "can choose to follow its own statute when faced with a conflict between its statute and the tax code." However, there is no facial conflict between the Staggers Act and the ERTA; the ERTA was enacted as "an effective way of stimulating capital formation in business generally," Pub.L. 97-34, 95 Stat. 172, 2 U.S.Code Cong. & Admin.News 119 (1981); section 10704(a)(2) of the Staggers Act is intended to establish revenue levels sufficient to attract and retain capital in railroads in particular. Thus, the ICC cannot maintain that the two laws directly contradict each other, thereby giving it license to ignore the tax code; at best it can maintain that in the ERTA the capital formation objective is unqualified, that in the Staggers Act that objective is qualified, and that the qualified objective of the Staggers Act should prevail over the unqualified objective of the ERTA as a directive to the ICC. This does not amount to an argument for ignoring the ERTA as an indication of congressional intent. Thus we can and should take into account the ERTA as a reinforcement of Congress' intent to further capital attraction in the railway industry, as in all businesses subject to the ERTA.
 
 
 65
 The question then is, given the strong intent of Congress to encourage investment in the railroads manifested in the Staggers Act and the ERTA, does the Staggers Act embody other congressional objectives which dilute the capital attraction goal? The ICC asserts that the Staggers Act embodies goals of accuracy and fairness to the shippers which it is allowed to balance against the goal of capital formation. ICC Brief at 28 (referring to 3 I.C.C.2d at 2030).
 
 
 66
 We agree in principle that the capital formation objective is qualified by other goals. The statute does not itself prescribe a formula for determining a railroad's revenue adequacy. It instructs the Commission to develop the necessary standards and procedures, taking into consideration the Congress' purposes in enacting the statute. These include, among the several goals, securing "a fair, reasonable, and economic profit or return (or both) on capital employed in the business," 49 U.S.C. Sec. 10704(a)(2), and "insur[ing] the retention and attraction of capital." Id. We think that the use of the terms "fair" and "reasonable" express Congress' intention that the Commission make its own assessment of the most accurate way to calculate the return on railroad capital. We see nothing in the statute requiring that all capital, regardless of its source, be treated identically for purposes of annual revenue adequacy determinations.
 
 
 67
 The railroads' second argument is that even if the regulation does not directly violate the statute, it represents a departure from existing Commission policy that the Commission has inadequately explained. Since an agency decision is arbitrary and capricious if the agency fails to "articulate a satisfactory explanation" for its action or fails "to consider an important aspect of the problem," Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983), we must examine the reasons the Commission gave for incorporating this accounting change into its railroad revenue adequacy formula, and decide whether in the context of the four other modifications of the formula we have already reviewed, the ICC's explanations are satisfactory.
 
 
 68
 In Ex Parte No. 393, Standards for Railroad Revenue Adequacy, the ICC stated that the deferred tax adjustment is necessary fundamentally because without it the Commission's revenue adequacy determinations are inaccurate. It observed that revenue adequacy determinations made since passage of the Staggers Act have indicated decreasing railroad revenue adequacy, whereas in its view they ought to be reflecting financial improvements resulting from the Staggers Act reforms. J.A. at 2030. The railroads argue that the previous measurements do not reveal any flaw in the formula but simply indicate that "rail earnings continued to be inadequate." Joint AAR Brief at 38. However, they concede that although "the earnings of many railroads have remained low or declined," id. at 39, "[e]arnings increased somewhat after passage of the Staggers Act." Id. at 38, n. 79. It seems to us, however, that the Commission is not making the premature assumption ascribed to it by the railroads, that the revised revenue adequacy formula it is proposing will necessarily result in industry-wide findings of revenue adequacy, but only that since it will better reflect increases in a railroad's earnings, whether or not these will amount to revenue adequacy, it ought to be permitted. Since the railroads do not dispute the ICC's limited conclusion that at least a modest inconsistency between railroad earnings and revenue adequacy determinations has opened up since the passage of the Staggers Act, we are satisfied that the Commission's explanation that it is undertaking an adjustment of its formula in the interests of accuracy is rational. Given the deferential scope of our review, we must therefore reject the railroads' challenge to the change in the standard for revenue accuracy which excludes deferred taxes from their rate base.
 
 III
 
 69
 We have rejected the shippers' challenge to the ICC decision (1) retaining the cost of capital as the single measure of revenue adequacy, (2) adhering to the current cost of debt as opposed to the cost of embedded debt in computing the cost of capital, (3) not requiring exclusion from the investment base of assets not used or useful in the railroad business, and (4) adopting a transition method of accounting for the change from betterment to depreciation accounting for track structures. We have rejected the railroads' challenge to the ICC decision excluding from the investment base for revenue adequacy determination reserves for deferred taxes. The decision in 3 I.C.C.2d 261 (1986) will in all respects be affirmed. Conrail's petition will be dismissed.
 
 
 
 [1]
 One petitioner, Consolidated Rail Corporation (Conrail) lacks standing to challenge the ICC decision because it did not actively participate as a party in the agency proceedings. See American Trucking Associations, Inc. v. ICC, 673 F.2d 82 (5th Cir.1982). The Conrail petition must therefore be dismissed, but the dismissal does not affect the issues which must be resolved, since the Conrail position on those issues is the same as that of the Association of American Railroads (AAR) which is a proper petitioner
 
 
 [2]
 In its brief, the ICC underscores the same point with references to 49 U.S.C. Sec. 11162(b)(2) and (4), and to 49 U.S.C. Sec. 11166, which instructs the ICC to avoid duplicating existing railroad accounting requirements, and by interpreting section 10704(a)(2)'s qualification of a "reasonable and economic" return on capital as allowing (if not requiring) a cost/benefit analysis. These particular statutory supports, however, are not contained in the ICC decision
 
 
 [3]
 The shippers misleadingly cite to the ICC final decision, 3 I.C.C.2d at 287, J.A. at 2045, for the statement that the increase resulting from the restatement amounts to "as much as $7 billion" for the industry as a whole. In fact, the ICC was merely noting that the expenses recorded under betterment accounting totaled $7.1 billion at the time of the transition--less than the amount of the industry's composite revenue shortfall--and therefore not possibly recovered in the past, contrary to the shippers' claim of a double recovery
 
 
 [4]
 Bessemer only considered the accelerated depreciation deduction authorized under 26 U.S.C. Sec. 167(b), although the further acceleration authorized under the ERTA, 26 U.S.C. Sec. 168 had been introduced into Congress prior to the time that the ICC issued the decision reviewed in Bessemer, and it had been signed into law while the Bessemer litigation was pending. Joint AAR Brief at 13, n. 28. The difference between section 167 and section 168 of the Internal Revenue Code is not, however, critical to this case